**WO**

# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Cathy Ly, | No. CV-18-02465-PHX-DWL |
| Plaintiff, | **ORDER** |
| v. | |
| Paragon Technology & Development Incorporated, et al., | |
| Defendants. | |

Pending before the Court are (1) a Rule 12(b)(6) motion for partial dismissal (Doc. 39) filed by Defendants Gatsby Enterprises Incorporated, Jude C. Hudson, Rosalie Hudson, Aaron Lee, and Paragon Technology & Development Incorporated (collectively "Defendants"), (2) Plaintiff Cathy Ly's motion for leave to amend her complaint (Doc. 50), and (3) Ly's motion to enforce the parties' purported settlement agreement (Doc. 55). For the following reasons, Defendants' motion to dismiss will be granted in part and denied in part, Ly's motion for leave to amend will be granted, and Ly's motion to enforce will be denied.

## BACKGROUND

### I. Factual Allegations

Ly brings this suit against Defendants, her former employers, related to her employment between March 2016 and February 2018. Among other things, Ly alleges that Defendants discriminated against her (1) based on her sex by treating her less favorably than similarly-situated males, and (2) based on her disability by demoting her immediately

after discovering her pregnancy and pregnancy-related disability.[1]  The factual allegations related to these claims, taken as true for the purpose of Defendants' motion to dismiss, are as follows.

Defendants "employ[] roughly 20-25 employees and operate[] out of a commercial office suite in Scottsdale, Arizona." (Doc. 31 ¶ 10.)  Ly began working for Defendants as an unpaid Graphics Designer intern in March 2016.  (*Id.* ¶ 43.)  During her four-month internship, Defendants paid a full-time male employee to perform the same or similar kind of work Ly performed.  (*Id.* ¶¶ 47, 63.)[2]  Ly was the only employee ever required to begin employment as an unpaid intern.  (*Id.* ¶ 50.)

In July 2016, Defendants offered Ly full-time employment in the position of Marketing and Communications Director at an annual base salary of $60,000, which was far below industry standards for comparable positions in the region.  (*Id.* ¶ 51.)  Defendants also agreed to increase Ly's annual salary to $72,000 on her one-year anniversary in July 2017.  (*Id.* ¶ 52.)

In July 2017, Defendants only raised Ly's salary to $66,000.  (*Id.* ¶ 66.)  Defendants didn't raise Ly's salary to $72,000 until approximately October 2017.  (*Id.* ¶ 67.)  Even with the raise, Ly was paid "significantly lower annual compensation than similarly-situated male employees."  (*Id.* ¶ 64.)

In December 2017, Defendants denied Ly a significant bonus they had paid unconditionally to all other similarly-situated male employees.  (*Id.* ¶ 69.)  They also revoked Ly's "modified work schedule privileges" but didn't revoke the modified schedules of other similarly-situated male employees.  (*Id.* ¶ 70.)

On January 5, 2018, Defendants granted Ly "a disability accommodation to work

---

[1]     Ly also asserts minimum wage claims (Counts 1-2), an overtime claim (Count 3), an unpaid wage claim (Count 4), and a COBRA claim (Count 9), but Defendants have not moved to dismiss those claims.

[2]     Although the SAC does not explicitly state that the full-time employee who was performing the "same or similar" work as Ly during her internship was male (Doc. 31 ¶ 47), the gender of this employee can be inferred from the separate paragraph of the SAC alleging that "[a]t all relevant times, Plaintiff was Defendants' only female employee, and all other employees were male" (*Id.* ¶ 63).

from home that related to a serious pregnancy complication and resulting medical condition." (*Id.* ¶ 72.) The accommodation was recommended by Ly's medical provider. (*Id.*)

On an unspecified date in January 2018, Defendants demoted Ly to the role of Marketing Coordinator and immediately hired a less-senior and less-experienced male employee to fill her former position. (*Id.* ¶ 71.) This occurred "immediately after [Defendants] received actual notice of her pregnancy and pregnancy-related disability." (*Id.* ¶ 134.)

At all relevant times, Ly was the only female employed by Defendants. (*Id.* ¶ 63.)

II. <u>Procedural Background</u>

On April 6, 2018, Ly filed this action in state court. (Doc. 1-1 at 3.)

On July 3, 2018, Ly amended her complaint. (*Id.* at 27-51.)

On August 3, 2018, Defendants removed the case to this Court. (Doc. 1.)

On December 17, 2018, Ly filed her Second Amended Complaint ("SAC"). (Doc. 31.)

On January 11, 2019, Defendants filed a motion for partial dismissal under Rule 12(b)(6). (Doc. 39.) The parties later filed a stipulation to extend certain deadlines so they could pursue mediation. (Doc. 46.) This caused the Court to delay consideration of the motion to dismiss. (Doc. 47.)

On June 25, 2019, the parties informed the Court their mediation had been "unsuccessful." (Doc. 49.)

On July 1, 2019, Ly filed a motion for leave to amend her SAC. (Doc. 50.)

On July 23, 2019, Ly filed a motion entitled "Motion to Enforce Settlement and Stay Discovery Deadlines." (Doc. 55.) In a nutshell, it argues that the parties continued engaging in settlement negotiations after the unsuccessful mediation, that these discussions culminated in the execution of a written settlement agreement on July 9, 2019, and that Defendants later reneged on that agreement. (*Id.*)

On September 4, 2019, the Court informed the parties that it wished to hear

argument on the pending motions on September 12, 2019, and further noted that, although the parties hadn't requested an evidentiary hearing on the motion to enforce, the Court would be willing to hold such a hearing at either party's request. (Doc. 63.)

On September 5, 2019, the Court issued a tentative order addressing the three pending motions. (Doc. 64.)

On September 6, 2019, Ly informed the Court that she wanted an evidentiary hearing. (Doc. 65.)

On September 12, 2019, the Court conducted an evidentiary hearing, during which four witnesses testified, and then heard argument on the pending motions.

## DISCUSSION

I.    Motion To Dismiss

A.    **Legal Standard**

"[T]o survive a motion to dismiss, a party must allege 'sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face.'" *In re Fitness Holdings Int'l, Inc.*, 714 F.3d 1141, 1144 (9th Cir. 2013) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (quoting *Iqbal*, 556 U.S. at 678). "[A]ll well-pleaded allegations of material fact in the complaint are accepted as true and are construed in the light most favorable to the non-moving party." *Id.* at 1144-45 (citation omitted). However, the court need not accept legal conclusions couched as factual allegations. *Iqbal*, 556 U.S. at 679-80. The court also may dismiss due to "a lack of a cognizable legal theory." *Mollett v. Netflix, Inc.*, 795 F.3d 1062, 1065 (9th Cir. 2015) (citation omitted).

B.    **Analysis**

1.    Sex Discrimination

In Count Five of the SAC, Ly asserts a claim for "Sex/Retaliation Discrimination" in violation of Title VII of the Civil Rights Act. (Doc. 31 ¶¶ 121-131.) Similarly, in Count Seven, Ly asserts a claim for "Sex/Retaliation Discrimination" in violation of the Arizona

Civil Rights Act ("ACRA"). (*Id.* ¶¶ 143-153.) In their motion, Defendants seek dismissal of these claims[3] because Ly hasn't sufficiently pleaded that "similarly situated individuals outside of her protected class were treated more favorably." (Doc. 39 at 3-7.) According to Defendants, Ly must allege she was similar to her proposed comparators "in all material respects," which typically requires allegations that proposed comparators "[had] the same supervisor, [were] subject to the same standards, and . . . engaged in the same conduct." (*Id.* at 3-4.) Defendants contend Ly hasn't pleaded *facts* related to these categories, only vague and conclusory allegations. (*Id.*)

In response, Ly argues she doesn't need to plead a *prima facie* case of sex discrimination because "the prima facie standard set forth under *McDonnell Douglas*,[4] is an evidentiary standard, not a pleading requirement." (Doc. 42 at 2-3.) Ly also contends that, in any event, she has alleged a prima facie case because the SAC specifically alleges she was demoted and replaced as Marketing and Communications Director "with a less senior and less experienced male employee." (*Id.* at 4, citing Doc. 31 ¶¶ 124, 156.) This, she argues, "is sufficient to properly plead the existence of similarly situated male counterparts who received more favorable treatment." (*Id.* at 4.) In addition, Ly argues the SAC alleges "she is the *only* female employed by Defendants, and the *only* employee being subjected to the negative treatment that she identifies." (*Id.* at 5.) Finally, she identifies "roughly thirty (30) paragraphs of allegations in support of showing the disparate treatment she experienced when compared to her male counterparts." (*Id.*)

As an initial matter, Ly is correct that her complaint doesn't need to track the *McDonnell Douglas* framework in order to survive a motion to dismiss. In *McDonnell Douglas*, the Supreme Court established "the order and allocation of proof" in a Title VII case. 411 U.S. at 800. That framework "is a tool to assist plaintiffs *at the summary*

---

[3] The ACRA "is modeled after federal employment discrimination laws—Title VII of the Civil Rights Act of 1964," *Francini v. Phoenix Newspapers, Inc.*, 937 P.2d 1382, 1388 (Ariz. Ct. App. 1996), and its discrimination provision is nearly identical to Title VII's. *Compare* A.R.S. § 41-1463(B)(1), *with* 42 U.S.C. § 2000e-2(a)(1). Accordingly, the Court will analyze the sufficiency of Counts Five and Seven simultaneously.

[4] *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973)

- 5 -

*judgment stage* so that they may reach trial." *Austin v. Univ. of Oregon*, 925 F.3d 1133, 1136 (9th Cir. 2019) (citation omitted) (emphasis added). As the Supreme Court reiterated in *Swierkiewicz v. Sorema N. A.*, 534 U.S. 506 (2002), "[t]he prima facie case under *McDonnell Douglas* . . . is an evidentiary standard, not a pleading requirement." *Austin*, 925 F.3d at 1136 (citation omitted). Thus, "the ordinary rules for assessing the sufficiency of a complaint apply" in Title VII cases. *Id.* at 1137 (citation omitted).

On the merits, although the SAC is larded with paragraphs that contain nothing but conclusory, fact-free assertions of sex discrimination (*see, e.g.,* Doc. 31 ¶¶ 62, 123, 145)— an improper pleading practice that *Twombly* and *Iqbal* were meant to eradicate—the Court concludes that other paragraphs of the SAC contain enough factual detail to survive dismissal. For example, the SAC alleges that Defendants required Ly to work as an unpaid intern for four months, which Defendants have never required a male employee to do, and that Defendants were "simultaneously" paying a full-time male employee "to perform the same or similar work" when Ly was completing this unpaid internship. (Doc. 31 ¶¶ 47, 50, 63.)[5] The SAC also alleges that, when Ly was demoted to the position of Marketing Coordinator in January 2018, Defendants "immediately hired a less-senior and less experienced male employee to replace her as the Marketing Director." (*Id.* ¶ 71.)[6] These

---

[5] In their reply, Defendants urge the Court to ignore the factual allegations in the SAC concerning the internship because "[w]hile [the SAC] makes several references to [Ly's] internship, these are solely in the context of her wage and hour claim." (Doc. 43 at 6-7.) This argument is unavailing. Counts Five and Seven of the SAC incorporate by reference all of the factual allegations contained in the SAC (Doc. 31 ¶¶ 121, 143)—this necessarily incorporates the internship-related allegations. Defendants also argue in their reply that the internship-related allegations should be ignored because any allegations of sex discrimination from the 2016 timeframe are now time-barred. (Doc. 43 at 7.) This argument fails because Defendants raised it for the first time in their reply. *Vasquez v. Rackauckas*, 734 F.3d 1025, 1054 (9th Cir. 2013) ("[I]ssues raised for the first time in reply briefs . . . [are] forfeited.").

[6] It should be noted that the SAC seems to characterize the January 2018 demotion as proof of retaliation. (Doc. 31 ¶ 71 ["In January 2018, after raising concerns of sex discrimination and differential treatment, Defendants demoted Plaintiff . . . ."].) Retaliation is not the same thing as sex-related discrimination. *Cf. Rivera v. Jones*, 2008 WL 4279628, *6 (S.D. Tex. 2008) ("The pleadings . . . seem to merge the notions of discrimination and retaliation, which are not the same thing."). Nevertheless, Title VII prohibits both forms of conduct, *see* 42 U.S.C. § 2000e-2(a)(1) (prohibiting discrimination because of the plaintiff's sex) *and* 42 U.S.C. § 2000e-3(a) (prohibiting discrimination because the plaintiff "has opposed any practice made an unlawful employment practice by this subchapter"), and Count Five of the SAC is styled as a claim for "Sex/Retaliation Discrimination." Thus,

- 6 -

are two specific instances in which the SAC plausibly alleges sex discrimination.

Given the presence of these allegations, it is unnecessary to decide whether the SAC could survive a motion to dismiss based solely on its other sex discrimination-related paragraphs, which allege that Ly was paid and/or treated differently than "similarly-situated male employees" but fail to specify who those other employees were. (*See, e.g.,* Doc. 31 ¶¶ 62, 64, 65, 69, 70.)  Nevertheless, it should be noted that other courts have deemed those sorts of allegations to be deficient. *See, e.g., Bekkem v. Wilkie*, 915 F.3d 1258, 1275 (10th Cir. 2019) ("A plaintiff's assertion that she is 'similarly situated' to other employees is 'just a legal conclusion—and a legal conclusion is never enough.'"); *Werner v. Advance Newhouse P'ship, LLC*, 2013 WL 4487475, *5 (E.D. Cal. 2013) ("Plaintiff alleges she 'was paid less than similarly situated male employees.'  However, that the male employees were 'similarly situated' is a legal conclusion.") (internal quotation marks and citations omitted).

## 2.    Disability Discrimination

In Count Six of the SAC, Ly asserts a claim for "Disability/Retaliation Discrimination" in violation of the Americans With Disabilities Act ("ADA").  (Doc. 31 ¶¶ 132-142.)  Similarly, in Count Eight, Ly asserts a claim for "Disability/Retaliation Discrimination" in violation of the ACRA.  (*Id.* ¶¶ 154-164.)  In their motion, Defendants seek dismissal of these claims[7] because Ly hasn't properly pleaded she has a disability under the ADA.  Defendants contend that Ly has "neglected to plead any facts regarding the severity of any limitations or restrictions on her ability to perform a major life activity, the anticipated duration of her impairment, or the type of major life activity that is allegedly

---

the allegations concerning the January 2018 demotion form part of a plausible Title VII claim.  *Cf. Humphries v. CBOCS West, Inc.*, 474 F.3d 387, 398 (7th Cir. 2007) (acknowledging that, "strictly speaking, a discriminatory 'termination of contract' is not the same thing as a retaliatory discharge—for instance, analytically, retaliation need not have a discriminatory intent behind it," but cautioning against a "heightened degree of formalism").

[7]      The Court addresses the two disability-related claims together.  *Shulock v. City of Tucson*, 2010 WL 2720839, *6 n.3 (D. Ariz. 2010) ("The Court's ADA . . . analysis applies to Plaintiff's ACRA claim.  If Plaintiff's claim does not survive under federal law, summary judgment is proper as to his state law claim as well.").

limited" and that such information is required "to determine whether [Ly] is a qualified individual with a disability." (Doc. 39 at 8-9.)

In response, Ly argues there are three tests to determine whether an individual is disabled under the ADA and ACRA: a person is "disabled" if she (1) has "a physical or mental impairment that substantially limits one or more of the major life activities of the individual," (2) has a "record of such an impairment," or (3) is "regarded as having such an impairment." (Doc. 42 at 6, citing 42 U.S.C. § 12101(1).) Ly asserts that Defendants' argument pertains only to the first test but doesn't address the sufficiency of the SAC's allegations related to the second and third tests. (*Id.* at 6-7.) She claims she has alleged sufficient facts that she has a "record of impairment" and Defendants "regarded her" as disabled. (*Id.* at 7-9.)

In reply, Defendants reiterate that Ly failed to satisfy the first test of "disabled." (Doc. 43 at 8.) Defendants also contend that Ly doesn't plead a "record of impairment" because that requires a person to have "'a history of, or [have] been misclassified as having, a mental or physical impairment that substantially limits one or more major life activities.'" (*Id.* at 9-10.) According to Defendants, Ly only contends she was treated unfavorably because of an active condition, rather than a past history of being disabled. (*Id.*) Finally, Defendants assert that Ly hasn't alleged facts demonstrating she was subjected to an adverse action because she was "regarded as" disabled by Defendants. (*Id.* at 10-11.)

The Court agrees with Defendants that Ly hasn't alleged sufficient facts to satisfy the first test—that she had "a physical or mental impairment that substantially limits one or more of [her] major life activities." The SAC alleges that Ly had "a serious pregnancy complication and resulting medical condition" for which Defendants eventually granted her a disability accommodation at the recommendation of her medical provider. (Doc. 31 ¶ 72.) This is sufficient to show that Ly suffered from a "physical or mental impairment." However, a person is covered by the ADA only if the impairment "substantially limits one or more . . . major life activities." 42 U.S.C. § 12102(1)(A). The SAC doesn't contain any allegations regarding how Ly was substantially limited in any major life activities. Thus,

it doesn't plausibly allege she was "disabled" within the meaning of the ADA.[8]

This is not some hyper-technical requirement. Indeed, as has become evident from the parties' litigation over the purported settlement agreement (see Part III *infra*), Defendants are entitled to know the nature of the impairment Ly claims to have sustained and to know how Ly contends she was limited by this impairment. This is one of the key issues in the case, yet it appears Ly has attempted to play coy with her pleading and discovery obligations concerning it.

The cases cited in Ly's opposition to the motion to dismiss, *Dykstra v. Florida Foreclosure Attorneys, PLLC*, 183 F. Supp. 3d 1222 (S.D. Fla. 2016) and *Quinn v. Chicago Transit Authority*, 2018 WL 4282598 (N.D. Ill. 2018), do not compel a different outcome. Those cases stand for the unremarkable proposition that a complaint doesn't need to contain "'magic words' that the impairment 'substantially limits one or more of her life activities.'" (Doc. 42 at 8-9.) The Court agrees. But in both cases, the complaint alleged at least some *facts* from which it could be inferred that the plaintiff's major life activities were substantially limited by the impairment. *Dykstra*, 183 F. Supp. 3d at 1230-31 (plaintiff sufficiently pleaded a disability where she "had a back injury and that this injury temporarily prevented her from working"); *Quinn*, 2018 WL 4282598 at *7 (plaintiff's allegations that he was "limited in activities such as performing manual tasks" and had "certain mobility impairments regarding one of his hands," while "not robust," nevertheless stated a plausible claim that he was disabled). Here, in contrast, although the SAC alleges

---

[8] *See, e.g., Marcelo v. Marciano*, 2017 WL 10545388, *3 (C.D. Cal. 2017) (dismissing complaint in part because "plaintiff alleges no facts plausibly suggesting that his kidney infection substantially limits at least one major life activity"); *Lenk v. Monolithic Power Sys., Inc.*, 2015 WL 6152475, *4 (N.D. Cal. 2015) ("[Plaintiff's] injury does not qualify as a disability as defined by the ADA, without further allegations that it 'substantially limits' a major life activity."); *Massaquoi v. D.C.*, 81 F. Supp. 3d 44, 55 (D.D.C. 2015) ("The plaintiff's complaint does not plausibly assert that he is disabled under the ADA because there is no allegation that his alleged 'anxiety disorder' substantially limits a major life activity. And, contrary to the plaintiff's position, having 'failed to allege facts sufficient to support a claim that he is substantially limited in a major life activity,' his ADA claim cannot survive a motion to dismiss.") (citations omitted); *Shaw-Owens v. The Bd. of Trustees of California State Univ.*, 2013 WL 4758225, *2 (N.D. Cal. 2013) (granting motion to dismiss because plaintiff merely alleged she had "serious health conditions which substantially impaired Plaintiff's major life functions, including but not limited to work").

that an "accommodation was recommended by [Ly's] medical provider," it doesn't allege what limitations Ly's impairment caused.

Ly's "record of impairment" argument fares no better. Because Ly has failed the first test—that she had "a physical or mental impairment that substantially limit[ed] one or more of [her] major life activities"—she cannot satisfy this test. "Analysis of the ADA statute confirms that a physical impairment must be deemed a disability before records of the impairment can constitute disability." *Zenaty-Paulson v. McLane/Sunwest, Inc.*, 2000 WL 33300666, *6 (D. Ariz. 2000). This is because "[t]he statute provides that an individual is disabled if she has 'a physical impairment that substantially limits one or more major life activities' or a 'record of *such* [an] impairment.'" *Id.* (citing 42 U.S.C. § 12102(2), emphasis added). "The term 'such [an] impairment' links the second prong with the definition set out in the first." *Id.* The bottom line is that Ly can't show she has a "record of such an impairment" because the SAC doesn't allege she even had a disability under the ADA.

Finally, Ly fails to plausibly allege that she was subjected to an adverse employment action because she was "regarded as" disabled. The SAC alleges Defendants demoted Ly "immediately after they received actual notice of her pregnancy and pregnancy-related disability." (Doc. 31 ¶ 156.) Ly contends this allegation is sufficient to state a claim because "[a]n inference of 'regarded as' disability discrimination may be made following adverse actions suffered by an employee shortly after an employer learns of the disability." (Doc. 42 at 7.) It's true that temporal proximity between an adverse action and an employer's discovery of an employee's disability can lead to the inference that the two are related. *See, e.g., Heierle v. Rampart Casino*, 2011 WL 3300185, *6 (D. Nev. 2011) ("Proximity of time between a protected activity and an adverse employment action may raise a plausible inference of a causal link where the time period is 'very close.'"). But mere temporal proximity to an adverse action doesn't necessarily make a claim plausible, especially where, as here, Ly hasn't pleaded any additional facts that would make her claims seem more than just conceivable. Indeed, elsewhere in the SAC, Ly contradicts her

claim that her demotion was because of her disability. The SAC alleges Ly was demoted "after raising concerns of sex discrimination and differential treatment." (Doc. 31 ¶ 71.) Given the lack of additional allegations (and the presence of contradictory ones), it's not plausible that Ly was demoted because Defendants perceived her pregnancy and pregnancy-related complications to qualify as a disability and then demoted her as a result of that perception.

## II.    Leave To Amend

Ly moves to amend the SAC to join Jessica Lee—Defendant Aaron Lee's wife—as a necessary party so, in the event Ly prevails in this lawsuit, she can recover against the Lees' community property. (Doc. 50.) Defendants oppose the motion because (1) Aaron Lee didn't marry Jessica Lee until after the conduct at issue in this case, (2) Ly's request to amend is untimely because the deadline to amend pleadings expired on December 17, 2018, and (3) Ly didn't comply with Local Rule 15.1 when filing the motion. (Doc. 52.) Additionally, in their motion to dismiss, Defendants ask the Court to dismiss Ly's sex and disability discrimination claims with prejudice. (Doc. 39 at 10.)

Ly's motion for leave to amend will be granted and Defendants' request for dismissal with prejudice will be denied. First, under Arizona law, "a nondebtor spouse is a necessary and proper party in a suit to establish the limited liability of the community . . . for separate, premarital debts." *Flexmaster Aluminum Awning Co. v. Hirschberg*, 839 P.2d 1128, 1132 (Ariz. Ct. App. 1992). Therefore, although Defendant Aaron Lee's conduct at issue in this case preceded his marriage to Jessica Lee, she is still a necessary party if Ly seeks to collect Defendant Aaron Lee's "contribution to the community property which would have been [his] separate property if single." *Id.*

Second, although the deadline for amending the pleadings had already expired by the time Ly filed her motion to amend, this doesn't mean Ly is foreclosed from seeking relief—it simply means her request is subject to Rule 16(b)(4)'s heightened "good cause" standard. *Johnson v. Mammoth Recreations, Inc.*, 975 F.2d 604, 607 (9th Cir. 1992). In her reply, Ly argues that good cause exists because (1) the parties agreed to stay this case

on multiple occasions so they could pursue mediation, (2) her former counsel "did not obtain confirmation that Defendant Aaron Lee was married until June, 2019," and (3) Defendants will suffer no unfair prejudice from a late amendment because the addition of Jessica Lee as a party will not alter the scope of discovery or trial. (Doc. 54 at 2.) The Court agrees and further notes that, because it will be granting Ly an opportunity to amend her allegations of disability discrimination, the prejudice to Defendants caused by the late Lee-related amendment is further attenuated.

Ly will be allowed to amend her disability discrimination claims (notwithstanding Defendants' request for a with-prejudice dismissal of those claims) because "leave to amend should be denied as futile only if no set of facts can be proved under the amendment to the pleadings that would constitute a valid and sufficient claim . . . ." *Barahona v. Union Pac. R.R. Co.*, 881 F.3d 1122, 1134 (9th Cir. 2018) (citation and internal quotation marks omitted). Here, the Court can't conclude that any future amendment would be futile. The SAC was deemed deficient because it doesn't explain whether, and to what extent, Ly's pregnancy-related complications substantially limited one or more major life activities. It's possible she can supply such facts in a new iteration of the complaint.

Finally, although Ly violated Local Rule 15.1 when she filed her motion to amend—she didn't provide a redlined version showing the new allegations concerning Jessica Lee—this procedural violation can be overlooked in light of the fact that Ly is now being granted leave to file a third amended complaint ("TAC") so she can attempt to remedy the deficiencies in the SAC related to her disability discrimination claims. Ly may file her TAC, in compliance with Local Rule 15.1(b), within 14 days of the date on which this order was issued.

III.    Motion To Enforce

A.    **Parties' Arguments**

On July 23, 2019, Ly filed a "Motion to Enforce Settlement and Stay Discovery Deadlines." (Doc. 55.) In it, Ly argues that the parties' attorneys continued to engage in settlement negotiations following the unsuccessful mediation on June 18, 2019, that

Defendants' counsel sent an email to her counsel on July 8, 2019 that offered to settle the case for $100,000 if "Plaintiff provides records that justify the work from home accommodation,"[9] and that on July 9, 2019, her counsel "accepted the settlement offer and provided records regarding the work from home accommodation." (*Id.* at 2-3.) Ly further contends that, notwithstanding her performance, Defendants have now "refuse[d] to acknowledge that the parties reached a settlement agreement and refuse[d] to perform in accordance with its terms." (*Id.* at 5.)

In their response, Defendants deny that a valid settlement agreement was ever reached. (Doc. 59.) As "an important backdrop to understanding the context of the settlement negotiations," Defendants explain that they "suspect [Ly] fabricated her pregnancy to excuse her poor work performance" and have thus made repeated demands for Ly's medical records throughout the discovery process in this case, which Ly has "inexplicably and steadfastly" refused to provide. (*Id.* at 2.) Defendants further contend that, during the mediation, they made a settlement offer that was "conditioned on [Ly] providing proof of her pregnancy" and continued insisting on the production of medical "records which might substantiate the pregnancy, including a professionally-administered pregnancy test, an ultrasound, or a record detecting a fetal heartbeat," during the post-mediation settlement discussions. (*Id.* at 3.) Defendants contend that the medical records Ly ultimately sent to them on July 9, 2019 fell far short of proving she had been pregnant or suffered a miscarriage—the records merely reflect that Ly self-reported a miscarriage to her doctor in late December 2017, nearly two months after it purportedly occurred, and did not seek any medical attention consistent with being pregnant or having a miscarriage between early October and late December 2017. (*Id.* at 5.) Given this background, Defendants argue their offer to settle upon receipt of "records that justify the work from

---

[9] The monetary portion of the settlement offer actually had three components: (1) "Defendants agreed to pay $100,000 to Plaintiff over 18 months"; (2) "Defendants offered to secure the agreement with a pocket judgment for $125,000.00, with a condition that the pocket judgment will not to be entered absent default not cured within 5 business days"; and (3) "The pocket judgment will be against Jude Hudson, Rosalie Hudson, Paragon, and Gatsby jointly and severally." (*Id.* at 2.)

home accommodation" was obviously a request for medical records verifying a pregnancy and miscarriage, not "a hearsay recitation of [Ly's] own claim to have been pregnant and suffered a miscarriage." (*Id.*) They further contend that the parties' conduct around the time of the alleged settlement on July 9, 2019—which is a relevant consideration under Arizona law when determining contractual intent—is inconsistent with having reached a final settlement. (*Id.* at 8-9.)

In reply, Ly doesn't dispute that Defendants' initial settlement demands were predicated on the production of medical records proving she had been pregnant but argues that the exchange on July 9, 2019—in which Defendants agreed to accept "records that justify the work from home accommodation"—shows that Defendants had changed their position and agreed to accept something less. (Doc. 62 at 2.) In a similar vein, Ly argues that, because her counsel acknowledged on July 1, 2019 that she had "no records that 'prove' pregnancy," it would be illogical to construe Defendants' subsequent emails as "expect[ing] to receive any records that proved that [Ly] was pregnant." (*Id.* at 2-3.) Finally, Ly contends she would not have "simply turn[ed] over the sensitive records" related to her pregnancy and miscarriage, which "revealed horrendous details," unless she had been convinced following the exchange on July 9, 2019 that these records would be deemed satisfactory by Defendants. (*Id.* at 5-6.)

B. **Legal Standard**

"It is well settled that a district court has the equitable power to enforce summarily an agreement to settle a case pending before it. However, . . . [w]here material facts concerning the *existence* or *terms* of an agreement to settle are in dispute, the parties must be allowed an evidentiary hearing." *Callie v. Near*, 829 F.2d 888, 890 (9th Cir. 1987) (citations omitted) (emphasis in original).[10]

On the merits, "[t]he construction and enforcement of settlement agreements are

---

[10] Here, although the parties didn't request an evidentiary hearing in their briefs, the Court informed them, in its order setting a hearing date on the motion to enforce, that it would convert the motion hearing into an evidentiary hearing upon request. (Doc. 63.) Ly subsequently made such a request. (Doc. 65.) Accordingly, on September 12, 2019, the Court held an evidentiary hearing.

governed by principles of local law which apply to interpretation of contracts generally." *Jeff D. v. Andrus*, 899 F.2d 753, 759 (9th Cir. 1989). In their briefs, both sides agree that Arizona law is the "local law" that should apply here. (*Compare* Doc. 55 at 4 ["Arizona law governs the interpretation of the parties' settlement agreement."], *with* Doc. 59 at 5-6 [citing Arizona law on contract formation].)

## C.    **Findings Of Fact**

The parties enclosed, as exhibits to their briefs, an array of emails and other documents. Some of those materials were also introduced and discussed during the evidentiary hearing. Additionally, Defendants submitted three declarations (from Defendant Aaron Lee, Defendant Jude Hudson, and Defendants' counsel Logan Elia) as attachments to their opposition to the motion to enforce and Ly called four witnesses (Lee, Hudson, Elia, and Ly's counsel Gayathiri Shanmuganatha) during the evidentiary hearing. The Court's findings of fact, set forth below in chronological fashion, are derived from those materials and testimony. Credibility findings are noted where appropriate.

Since the inception of this case in mid-2018, Defendants have made repeated requests for medical records corroborating Ly's allegation that she was pregnant and suffered a miscarriage. For example, on October 31, 2018, Elia wrote an email to Shanmuganatha stating in part as follows: "Your MIDP response . . . appears to be missing many relevant documents, including Ms. Ly's medical records to support her miscarriage and counseling allegations . . . ." (Doc. 59-1 at 11.) These records should have been produced by Ly at the outset of the case pursuant to the District of Arizona's mandatory initial disclosure pilot project ("MIDP").

On January 9, 2019, Ly provided her response to Defendants' first request for the production of documents. (Doc. 59-1 at 61-72.) One of the categories of documents being sought by Defendants was "[a]ll documents relating to any and all medical treatment, counseling, psychological treatment, alcohol or drug rehabilitation, or other treatment of physical, emotional or mental symptoms identified in any of Plaintiff's responses to Defendants' First Set of Interrogatories." (*Id.* at 66.) In response, Ly wrote (after providing

a series of objections) that "*[a]ll documents responsive to this request and in Plaintiff's possession, custody and control have already been produced to Defendants as part of Plaintiff's MIDP responses or disclosures.*" (*Id.* at 67, emphasis added.) This statement was false—as discussed below, the key medical records had not yet been produced by Ly and would not even be gathered by Shanmuganatha until June 28, 2019.[11]

On June 18, 2019, the parties engaged in a mediation. It did not result in a settlement. During the mediation, Defendants made settlement offers that were contingent upon Ly's production of medical records proving that she had, in fact, been pregnant and suffered a miscarriage.[12] However, no such records were produced during the mediation.

On June 28, 2019, Shanmuganatha and Elia spoke on the phone about continuing the settlement discussions. During this conversation, Elia again made clear that, from Defendants' perspective, any settlement was contingent upon Ly's production of medical records verifying her claims. (Doc. 59-1 at 3-4 ¶¶ 9-10.) Lee and Hudson similarly testified credibly, in their declarations and during the evidentiary hearing, that the post-mediation settlement discussions were conditioned upon such verification. (Doc. 59-1 at 95 ¶¶ 8-9 [Hudson declaration], 98 ¶¶ 4-5 [Lee declaration].)

On June 28, 2019 at 5:47 pm—some time after her phone conversation with Elia had ended—Shanmuganatha wrote an email to Elia that stated in its entirety as follows: "We have records." (Doc. 62 at 22.) During the evidentiary hearing, Shanmuganatha explained that she sent this email because she had finally seen Ly's medical records. She

[11]　　There is some question whether the medical records had been obtained and reviewed by another one of Ly's attorneys by January 2019 (and simply not turned over to Defendants) or whether Ly's attorneys had not yet obtained them from Ly's doctor. It doesn't really matter, because Ly was required to produce them either way. Nevertheless, the Court notes that Elia testified during the evidentiary hearing that he had a conversation with Shanmuganatha after the Rule 16 conference (which occurred on November 15, 2018, *see* Doc. 22) during which Shanmuganatha told him the medical records corroborated Ly's claims. Shanmuganatha, meanwhile, testified during the evidentiary hearing that she didn't recall having such a conversation with Elia in November 2018 and that her firm didn't obtain the medical records until June 28, 2019.

[12]　　Although Ly attempted to show, during the evidentiary hearing, that some of the settlement offers made during the mediation were not expressly conditioned upon the production of such medical records, Lee, Hudson, and Elia credibly testified that the importance of such records to them would have been apparent to any reasonable observer under the circumstances.

- 16 -

further admitted this was the first time anybody from her firm had obtained the medical records.

On July 1, 2019, Elia and Shanmuganatha exchanged a series of emails following up on Shanmuganatha's "We have records" email of June 28, 2019. Those emails are summarized as follows:

▪ At 9:15 am, Elia wrote: "Great. Please see what you can do about providing a record." (Doc. 62 at 22.)

▪ At 9:29 am, Shanmuganatha replied: "Please send me the offer that you outlined on Friday so we have a concrete offer to move forward on." (Doc. 62 at 24.)

▪ At 3:39 pm, Elia replied: "[W]e will pay $100,000 over 18 months . . . . The offer is contingent upon you first disclosing a medical record establishing [Ly's] pregnancy." (Doc. 62 at 28.)

▪ At 3:46 pm, Shanmuganatha replied: "[P]lease identify what you mean by 'disclosing a medical record establishing [Ly's] pregnancy.' As we've discussed, [Ly] took a home pregnancy test . . . and went to the doctor as a follow-up for her miscarriage. If you are looking for a positive pregnancy test, then all we have is [Ly's] testimony. But I have seen her medical records following her miscarriage describing her bleeding, blood clots, cramping and depression." (Doc. 62 at 30.)

▪ At 4:07 pm, Elia replied: "We discussed at length what sort of records might exist, specifically that there might be records to indicate the pregnancy or [there] might just be records that reflect [Ly] having reported a miscarriage. We discussed that if the pregnancy was short enough, [Ly] might not have records to directly indicate [ ] the pregnancy. However, if the pregnancy were longer, we could expect that some records, for example an ultrasound or notation of observed fetal heart rate, would exist. You did not know whether records that directly indicated the pregnancy existed because [prior counsel] had reviewed the medical records. You did not know how long the pregnancy lasted. You said you would call [prior counsel] and find out. Then, you sent me an email that said 'we have records.' I assumed, based on our conversation and where we left it, that records indicating

the pregnancy would be forthcoming."  (Doc. 62 at 34.)

▪ At 4:09 pm, Shanmuganatha replied: "We have records following the miscarriage but, as expected, she was in early in her first trimester when she miscarried.  I hope you understand that I don't want to hand over records willy-nilly without having an understanding whether it would be worth the trauma I am putting [Ly] through."  (Doc. 62 at 32.)

The next significant exchange of email correspondence occurred on July 8, 2019.  The relevant emails are summarized as follows:

▪ At 9:48 am, Shanmuganatha wrote to Elia: "Settlement—I don't know if you had a chance to connect with your client about settlement terms following our conversation last Tuesday [July 2, 2019].  Can you give me an update?"  (Doc. 62 at 36.)

▪ At 12:34 pm, Dan Gauthier (Elia's co-counsel, who was filling in while Elia was out of the country on vacation) replied: "I'm headed into another meeting shortly but wanted to send you a quick email regarding settlement.  My clients are willing to settle this case on the terms you discussed with Logan last week, on the condition that you first provide satisfactory evidence of the pregnancy and miscarriage.  My clients require more than the previously provided letter from MomDocs, which I think we can agree does not irrefutably prove the same (nor does it reference a pregnancy or miscarriage).   What additional evidence can you provide?" (Doc 59-1 at 89-90.)

▪ At 12:43 pm, Shanmuganatha replied: "To be clear, the terms I discussed with Logan are as follows: . . . . [The mediator] shall be the arbiter of whether the evidence regarding pregnancy and miscarriage is satisfactory since he had a chance to meet and hear from [Ly] and can look at the documentary evidence and the credibility of the witness in making the determination.  In addition to the documents, will be happy to make [Ly's] physician available to [the mediator]."  (Doc. 59-1 at 88-89.)

▪ At 12:58 pm, Gauthier replied: "[The mediator's] review of the documents is unnecessary given your confirmation that you've seen your client's medical records describing her bleeding, blood clots, cramping and depression.  My understanding is [the

mediator's] review was discussed in connection with being arbiter of a claim that [Ly's] pregnancy claim was fraudulent (obviating my client's need to pay), not in connection with settlement." (Doc. 59-1 at 88-89.)

▪ At 1:01 pm, Shanmuganatha replied: "So who will be deciding whether the records are 'satisfactory' of the pregnancy and miscarriage?" (Doc. 62 at 40.)

On July 9, 2019, the email correspondence continued. At 10:52 am, Shanmuganatha wrote: "I am on the phone with [Ly] and I want to confirm that, with regards to [the records], you are looking for records that justify the work from home accommodation." (Doc. 59-1 at 87.) At 1:00 pm, Elia (who was now back in the country) replied: "Yes, that is what I am looking for." (Doc. 59-1 at 86.) Finally, at 1:09 pm, Shanmuganatha sent an email to Elia that contained, as an attachment, a few pages of medical records. (Doc. 59-1 at 86.) The final sentence of the email provided: "My clients agree to the other terms discussed [earlier]." (*Id.*)

The actual medical records that were enclosed with Shanmuganatha's July 9, 2019 email (Doc. 55-1 at 10-22) reveal that Ly visited a medical clinic called "MomDoc for Women" twice: once on December 26, 2017, and again on January 4, 2018. The notes from the first visit state that Ly told the doctor that "her last regular period was in September. She took 2 pregnancy tests at the [beginning] of October, and in November. She had heavy bleeding for 3-4 days in early [N]ovember, passed several large blood clots the size of quarter. She also reported cramping. She was soaking through pad within a couple hours. She then took a pregnancy test right after and it was still positive. She wants to know if this is normal. She has not had any bleeding since the beginning of November. Denies cramping, pelvic pain, fever, chills." (*Id.* at 13.) The notes from this visit further state that the doctor told Ly "it is possible she had a miscarriage at the beginning of November." (*Id.* at 15.) The notes from the second visit contain the following summary: "States is going through a real[l]y tough time of adjusting to a SAB [spontaneous abortion, aka miscarriage] C/o fatigue, exhaustion, difficulty sleeping, cannot concentrate at work, cr[ie]s, overall feels uncomfortable around her work environment. States is working at a

company with men who do not understand her feelings. 'I have to wear this mask.' I need some time to adjust for grieving." (*Id.* at 19.) The notes further reflect that, at the conclusion of the visit, the doctor recommended that Ly receive "social support, counseling and psychotherapy" and "[a] note to work [was] given to allow to work from home." (*Id.* at 21.)[13]

On July 10, 2019 at 2:19 pm, Elia sent an email to Shanmuganatha concerning the schedule for an upcoming deposition. (Doc. 59-1 at 107.) This email requested a cancellation of the deposition due to the deponent's medical issues (*i.e.,* not because the case had settled). (Doc. 59-1 at 107.) At 4:57 pm, Shanmuganatha replied: "I believe that we have an enforceable settlement agreement. To the extent you disagree, and can successfully argue that there was no settlement, the disagreement/argument is counter to, at a minimum, Aaron Lee's interest (because he has no exposure) and also Paragon's and Gatsby's." (Doc. 62 at 60.) At 5:16 pm, Elia sent another email to Shanmuganatha concerning the deposition. (Doc. 59-1 at 106.) This email included the following: "With respect to your email regarding your belief we have an enforceable settlement agreement, we disagree." (*Id.*) Finally, at 5:27 pm, Shanmuganatha replied by saying she was "disappointed" in Elia and questioning whether the deponent's medical issues were truly preventing him from being deposed. (Doc. 59-1 at 117.)

D. **Analysis**

The enforceability/existence of the settlement agreement turns on what the parties intended through their email correspondence on July 9, 2019. During the key exchange, Shanmuganatha sought clarification from Elia that "you are looking for records that justify the work from home accommodation" and Elia replied: "Yes, that is what I am looking for." (Doc. 59-1 at 86-87.) Afterward, Shanmuganatha sent an email to Elia that contained several pages of medical records. Those records reveal that, on December 26, 2017, Ly

_____

[13] The actual doctor's note, which is dated January 4, 2018, provides in its entirety as follows: "To whom it may concern: Cathy is going through a difficult adjustment period from a loss. Please allow [her] to work from home." (Doc. 55-2 at 11.)

- 20 -

self-reported to a doctor that she'd suffered a miscarriage in "early November" 2017. About a week later, Ly went back to the doctor and complained of depression. In response, the doctor wrote a note stating that Ly should be "allow[ed] to work from home" because she "is going through a difficult adjustment period from a loss."

Ly argues an enforceable settlement arose from this exchange because she provided exactly what Defendants had bargained for—records justifying the work-from-home accommodation request she made while still employed by them in January 2018 (an accommodation request that forms part of the basis for the claims in the SAC). In Defendants' view, the records provided by Shanmuganatha were insufficient because they were actually seeking documentation proving that Ly was pregnant and then suffered a miscarriage in the fall of 2017 (beyond Ly's uncorroborated claims to doctors).

Under Arizona law, "[i]t is well-established that before a binding contract is formed, the parties must mutually assent to all material terms. A distinct intent common to both parties must exist without doubt or difference, and until all understand alike there can be no assent. If one party thinks he is buying one thing and the other party thinks he is selling another thing, no meeting of the minds occurred, and no contract is formed." *The Hill-Shafer Partnership v. Chilson Family Trust*, 799 P.2d 810, 814 (Ariz. 1990) (citations omitted). Such mutual assent must be "based on objective evidence, not on the hidden intent of the parties." *Id.* at 815. One way of showing a lack of mutual assent is to show that the words of the purported agreement are "uncertain or ambiguous" and have a "dual meaning." *Id.* at 815-16 (citations omitted). However, even in the absence of ambiguity, "[a]s long as the misunderstandings of the parties are reasonable under the specific circumstances of the case, a court may properly find a lack of mutual assent." *Id.* at 816.

Here, it is absolutely clear to the Court that the parties did not jointly understand the July 9, 2019 email exchange as an agreement that Defendants would settle the case upon receipt of records showing that Ly had self-reported a miscarriage to a doctor nearly two months after it is alleged to have occurred. On multiple occasions between June 18, 2019 and July 9, 2019, Defendants and their counsel made clear that they would only accept

medical records validating the existence of a pregnancy. They were steadfast in this position during the mediation and during much of the post-mediation email correspondence. Moreover, during the disputed exchange itself on July 9, 2019, Elia never expressly withdrew this position or expressly stated that Ly's self-report to her doctor (which Defendants had been saying, for weeks, was insufficient) was suddenly acceptable.

Given all of this, Ly is left with the argument that Elia's acknowledgement that he was "looking for records that justify the work from home accommodation" was an offer to accept something other than records proving Ly's pregnancy and constituted an implicit abandonment of a critical long-held position. Although Ly has identified various reasons why she may have honestly viewed the July 9, 2019 exchange as constituting such an implicit concession, this does not mean it is the only understanding both parties necessarily must have shared. Under the circumstances, the Court easily concludes that Elia could have reasonably reached a different interpretation. And under Arizona law, "[a]s long as the misunderstandings of the parties are reasonable under the specific circumstances of the case, a court may properly find a lack of mutual assent." *Hill-Shafer Partnership,* 799 P.2d at 816.

For example, during the July 1, 2019 email exchange, Shanmuganatha represented that, although the medical records did not reflect "a positive pregnancy test," "I have seen [Ly's] medical records following her miscarriage describing her bleeding, blood clots, cramping and depression." (Doc. 62 at 30.) During the evidentiary hearing, Elia testified that he interpreted this email as saying that Ly's medical records would show that a *doctor had observed* Ly suffering from bleeding, blood clots, cramping and depression, not that Ly had self-reported those symptoms to a doctor nearly two months after they occurred. This was a reasonable interpretation under the circumstances, and it explains why it was also reasonable for Elia to interpret the July 9, 2019 email from Shanmuganatha (which sought verification that "records that justify the work from home accommodation" would be acceptable) as again referring to records containing a doctor's observation of Ly's miscarriage-related symptoms. There was simply no meeting of the minds.

This conclusion is further bolstered by the parties' conduct around the time of the purported settlement. *See, e.g., Johnson Int'l, Inc. v. City of Phoenix*, 967 P.2d 607, 612 (Ariz. Ct. App. 1998) ("A court may look to surrounding circumstances and the conduct of the parties to determine the parties' intent.") (citation omitted). On July 10, 2019, the parties continued discussing the scheduling of depositions for witnesses. This is not how parties who believed they had just entered into a binding global settlement would react. Additionally, Elia informed Shanmuganatha on July 10, 2019 that he didn't believe a settlement had been reached. This was within one day of the purported meeting of the minds. Finally, it is worth noting that although Shanmuganatha stated in her email of July 10, 2019 that "I believe that we have an enforceable settlement agreement," she immediately qualified that statement by saying "[t]o the extent you disagree, and can successfully argue there was no settlement, the disagreement/argument is counter to [other Defendants' interests]." If Shanmuganatha truly believed the parties had reached a settlement (and had given their mutual assent), it's unclear why she would have provided such a qualifier.

Finally, the Court is troubled by the fact that Ly's counsel believed it was acceptable to withhold the key underlying medical records in this case from Defendants and to condition the production of those records on Defendants' agreement to settle. This is exactly what Shanmuganatha said to Elia during one of the underlying email exchanges (Doc. 62 at 32 ["I don't want to hand over records willy-nilly without having an understanding whether it would be worth the trauma I am putting [Ly] through."]) and what Ly has again argued in her motion papers (Doc. 62 at 5-6 [arguing she would not have "simply turn[ed] over the sensitive records" unless convinced by the email exchange on July 9, 2019 that these records would be deemed satisfactory for settlement purposes]). This case has been pending in federal court for over a year—it was removed from state court on August 3, 2018 (Doc. 1)—and Ly was obligated to produce, as part of her mandatory *initial* disclosures in this case, all "information as to facts that are relevant to the claims and defenses in the case, whether favorable or unfavorable, and regardless of

whether [she] intend[s] to use the information in presenting [her] claims or defenses." D. Ariz. G.O. 17-08(A)(4). The medical records that Ly belatedly produced to Defendants on July 9, 2019 (and falsely claimed not to exist in her January 2019 response to Defendants' request for production) should have been produced much earlier, not withheld and then dangled as a carrot to induce settlement.

During the hearing on the motion to enforce, Ly's counsel sought to sidestep these discovery failures by arguing they are irrelevant to the separate question of whether the parties entered into a binding settlement agreement. This argument lacks merit. As the months dragged on, and Ly's attorneys kept stonewalling the production of plainly discoverable documents, it is reasonable to infer that this delay might have raised suspicions in the minds of Defendants (and Defendants' counsel) and caused them to doubt whether the medical records actually corroborated Ly's claims. And given these growing doubts and suspicions, it is reasonable that Defendants might have insisted on the production of the medical records as a prerequisite to any agreement to settle. All of this helps explain why it was reasonable for Defendants to interpret the July 9, 2019 email, which required Ly to produce "records that justify the work from home accommodation," as a requirement that Ly produce medical records verifying that she had a condition that required her to work from home.

Accordingly, **IT IS ORDERED** that:

1. Defendants' motion to dismiss for failure to state a claim (Doc. 39) is **granted**;

2. Ly's motion for leave to amend (Doc. 50) is **granted**;

3. Ly's motion to enforce (Doc. 55) is **denied**;

4. Defendants' request for attorney fees is **denied;** and

5. Ly may file a third amended complaint, in compliance with Local Rule 15.1(b), within 14 days of the date on which this Order was issued.

Dated this 13th day of September, 2019.

Dominic W. Lanza
United States District Judge

- 24 -